## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVE CADAPAN, on Behalf of Himself and All Others Similarly Situated, | Civil Action Number: |
| Plaintiff, | |
| - *against* - | **JURY TRIAL DEMANDED** |
| FANDUEL, INC. and DRAFTKINGS, INC. | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Dave Cadapan ("Plaintiff"), individually, and on behalf of all others similarly situated, by and through counsel, brings this action against FanDuel, Inc. ("FanDuel") and DraftKings, Inc. ("DraftKings"), (collectively "Defendants"), and states as follows:

## NATURE OF THE CASE

1.      This is a class action complaint against FanDuel and DraftKings, two companies operating daily fantasy sports ("DFS") websites in a manner that violates California law, and analogous common and consumer protection laws in each state in which they operate, including New York.

2.      DFS websites exist as a non-regulated industry where individuals compete against other individuals in fantasy sports games on a daily basis.  Defendants operate contests or tournaments where individuals accumulate points based on the real-life statistics of players in professional sporting events that occur on a particular day.  Individuals can play for free or pay money to compete for cash prizes.

3.      Defendants' advertisements and websites market and represent DFS as a game of skill, like chess or the stock market.

4.      Defendants receive a fee from each entry into their contests.  The prize pools of these contests are funded from entry fees.  Defendants often guarantee prize pools and will pay out the difference between the guarantee and the entry fees.  The difference between the entry fees in the prize pool and the guarantee is called the "overlay."

5.      The "overlay" serves as an additional incentive for Defendants to attract as many users and entries as possible into contests to avoid that financial obligation.  The "overlay" also provides an incentive for Defendants to create, foster and permit an environment for their own employees and insiders to win prize pool money by taking advantage of inside information. However, competition by insiders based on inside information — thus creating an uneven and unfair competitive field — was not disclosed and remained concealed prior to October 6, 2015.

6.      DraftKings refers to its new users as "fish" and relies on new users who lack skill to keep its most active users – and therefore most profitable entry fee generators – on their site.[1] The CEO of FanDuel has also recognized the need to attract as many new, inexperienced players as possible to keep its most profitable players happy.[2]  According to one analysis, the top 1.3% of players paid 40% of the entry fees, and the most active 6.3% of players paid 76% of entry fees.[3]

7.      At the start of the 2015 NFL season, Defendants engaged in a huge media blitz, spending more than $100,000,000 on television ads, thereby becoming two of the top television

---

[1] *Id.*; *see also* https://rotogrinders.com/threads/dk-frequent-player-points-130623 (last visited Nov. 5, 2015); https://rotogrinders.com/threads/draft-kings-emails-your-opponents-to-edit-their-lineups-8230-269716?page=5 (last visited Nov. 5, 2015) (posts by user JRobs, the online screen name for DraftKings CEO Jason Robins)

[2] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=10 (last visited Nov. 5, 2015)

[3] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (last visited Nov. 5, 2015)

advertisers in the United States.  Defendants added millions of new users as a result of this advertising.[4]

8.      By creating and permitting an environment of competing on inside information by their employees and insiders, without disclosure to non-insider competitors, Defendants' advertisements and websites were materially false and misleading.  Defendants' material misrepresentations and omissions in their advertisements and websites fraudulently induced Plaintiff and the proposed classes to give Defendants money, which ultimately went to Defendants and their employees and insiders through fees and contest prizes.

9.      Plaintiff Dave Cadapan deposited and risked his own funds on FanDuel tournaments and contests.  Without a class action in this Court he would not be able to feasibly, economically or otherwise reasonably protect his rights, nor would any of the members of the proposed Classes (defined below).

## PARTIES, JURISDICTION AND VENUE

10.      Plaintiff Dave Cadapan is a resident and citizen of San Diego County, California. He brings this action on behalf of himself individually, and on behalf of classes of persons similarly situated, as described below.

11.      Defendant FanDuel, Inc., is a Delaware corporation with its principal place of business in New York, New York.

12.      Defendant DraftKings, Inc., is a Delaware corporation with its principal place of business in Boston, Massachusetts.

13.      This Court has subject matter jurisdiction over the parties because a substantial number of the events giving rise to this complaint occurred in New York, including the activities

---

[4] http://blogs.wsj.com/cmo/2015/09/16/are-draftkings-and-fanduel-bombarding-fans-with-too-many-ads/ (last visited Nov. 5, 2015)

of FanDuel and some or all of the concerted activities of the Defendants.  Additionally, the Southern District of New York is the proper venue for this action because FanDuel's headquarters are located in the Southern District of New York and many of the events giving rise to the Complaint occurred here.

## FACTUAL BACKGROUND

### A.  Daily Fantasy Sports

14.     Defendants are able to operate their websites because they market DFS as a game of skill, like chess or the stock market.  It is also similar to pari-mutuel horse race wagering in that players compete against each other for prize pools, and Defendants take their fee from the prize pool itself.

15.     Defendants held themselves out to Plaintiff and the Classes as places where their skill made the difference between winning and losing.  For instance, in a television commercial (available at https://www.youtube.com/watch?v=VDa-cDu8KYg) that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your skills….you like football, you like winning."   In another commercial in August 2015 (available at https://www.youtube.com/watch?v=bfCm6PJuL5I), DraftKings advertised its website as "a game within the game, that requires a different set of skills…we don't just play, we are players, we train, and we win."

16.     Similarly, FanDuel advertised (available at http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge) that players could "get paid for [their] knowledge" if they were "smarter than the average fan."

17.     In reality, most of the money on DFS sites goes to a few individuals at the top. An analysis of publicly available data by Sports Business Daily found that in the first half of the

2015 Major League Baseball season, 91% of profits were won by just 1.3% of players.[5]   An analysis done by Bloomberg showed a similar distribution heavily weighted towards the top 1% of players.[6]

### B.  Value of Inside Information and Data

18.     DFS customers play against each other by choosing a line-up of athletes until they have reached a "salary cap" for their team, and then entering tournaments with entry fees as low as 25 cents and as high as $5,300.   The players whose fantasy teams score the most points – based on the real statistics of the athletes in those games – win the most money.

19.     DFS is not perceived as gambling because of the supposed skill involved in picking a winning team.   According to DraftKings's CEO Jason Robins, DraftKings attracts players "who are analytical and favor data and research."   Robins said, "They do their homework.  It's like the stock market.  They enjoy looking at something and trying to figure out something that someone else doesn't see."[7]

20.     The biggest edge any player can have comes from having access to more data and information than that player's competitors, and DraftKings and FanDuel employees have access to more data and information than is accessible to the public.  For instance, DraftKings performs analytics to determine winning strategies, return on investment of certain strategies, and even how lineups on FanDuel would do if they were entered into DraftKings contests.  DraftKings

---

[5] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (last visited Nov. 5, 2015).

[6] http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (last visited Nov. 5, 2015)

[7] Howard Stutz, *DraftKings CEO Compares Fantasy Sports to Chess, Stock Investing*, Las Vegas Review-Journal, (Sept. 29, 2015), available at http://www.reviewjournal.com/business/casinos-gaming/draftkings-ceo-compares-fantasy-sports-chess-stock-investing (last visited Nov. 5, 2015)

knows the value of this data and knows that it should not be shared, as CEO Robins revealed in an online forum:

> The reason that I don't want to give the actual numbers is because I believe it creates a slippery slope where people start requesting stats on win rates of various strategies, which I believe is not a positive thing… That said, I really don't think site owners should be sharing stats on winning vs. non-winning strategies.  Part of what makes this a skill game is that people who are skilled at it can figure out for themselves how to win consistently.  And on that note, I do also want to point out that skilled stacking is absolutely a winning a strategy on DK. There are plenty of people who stack and win very consistently.[8]

Another DraftKings representative demonstrated his access to such insider information in the same forum: "A lot of mixed teams that are winning on other sites would fade the stacks on DK and win if they were just entered.  But they are not being entered. Take a look at some other site winning lineups and add it up for DK, you'll see it happening."[9]

21.    In addition to years of data on optimal strategies, which gives Defendants' employees a huge advantage over even the most "skilled" DFS players, Defendants' employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

22.    Defendants also set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

23.    Because the goal is to beat the other players, a player with statistical data about ownership percentages of competitors would have an edge over players without this data in many

---

[8] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5 (last visited Nov. 5, 2015)

[9] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=7 (last visited Nov. 5, 2015)

ways, including the ability to make rosters with enough players different from competitors' rosters.

24.     Indeed, a DraftKings employee named Ethan Haskell accidentally posted ownership percentages online before they were supposed to be publicly available – that is, before all of the contestants' lineups were "locked" and could therefore still be changed.  This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."[10]

25.     However, the same week that Haskell posted roster data before he was supposed to, he played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000.[11]  An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to inside DraftKings working for a DFS company.

26.     DraftKings and FanDuel, in concert, said that the fact that this employee beat 229,883 people in the same week he had access to non-public ownership data was a "coincidence."[12]

27.     Indeed, only days after the Haskell story broke, FanDuel reported that DraftKings employees have won at least $6,000,000 playing at FanDuel,[13] which is more than one million dollars per year considering DraftKings is only a few years old.  The ability of FanDuel to

---

[10] https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635 (last visited Nov. 5, 2015).

[11] http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (last visited Nov. 5, 2015).

[12] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (last visited Nov. 5, 2015)

[13] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fanduel-2015-10 (last visited Nov. 5, 2015)

calculate that information within days after the public became aware of this controversy shows that FanDuel can track which players are from other DFS sites and how much they are winning, losing, or otherwise what the possibility is that other DFS employees are using non-public information, data and insider strategic information.

28.     DraftKings was well aware that its employees were playing at FanDuel, and was aware that some of its employees made more money from winnings on FanDuel than their actual salaries.[14]

29.      Similarly, Fanduel was well aware that its employees were playing at DraftKings, and was aware that some of its employees made more money from winnings on DraftKings than their actual salaries.  To wit, before the Haskell story broke, FanDuel had profiled one of its own employees, Matthew Boccio, who played on other sites and had won $50,000 in a short period of time.[15]  FanDuel has since removed the article from its website.

30.     Boccio used the screen name PetrGibbons to hide his true identity and occupation at FanDuel from other DFS players.[16]

31.     An analysis by DFS Report shows that Boccio is one of the top 50 players in all of DFS despite only playing on one site.[17]  This individual won more than $50,000 in the early part of the baseball season on other sites.  One of his jobs includes setting player prices, which

---

[14] https://www.bostonglobe.com/business/2015/10/05/draftkings-bans-employees-from-competitors-sites/s36ig5e0eV0OR9C55R8hwL/story.html (last visited Nov. 5, 2015)

[15] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (last visited Nov. 5, 2015)

[16] Peter Gibbons is actually the name of the main character in the movie Office Space, in which employees at a software company engage in a scheme to steal money repeatedly from a large number of people in small quantities so as to avoid detection. This scheme, generally known as "salami slicing" was also the plot of Superman III. (*See* http://www.imdb.com/title/tt0151804/plotsummary) (last visited Nov. 5, 2015)

[17] https://dfsreport.com/6898/follow-up-to-draftkings-fanduel-mishaps/ (last visited Nov. 5, 2015)

gives him detailed daily information about pricing models and could help him identify inefficiencies or opportunities on other sites.  While the article profiling him has been removed from FanDuel's website, excerpts from it have been copied into other articles.  That profile noted that Boccio would not disclose the data he based his strategy on: "'I am not comfortable giving that away,' he said. 'I think sharing that could hurt my edge a little bit. After all, I am playing for money.'"  The profile concluded, "The fact Boccio does not play on FanDuel against you folks is a good thing. He clearly has a winning strategy…or 10."[18]

32.     After the story broke, DraftKings CEO Robins admitted that he had "had reservations" about allowing employees to play on other sites and allowing other sites' employees to play on his site, and even spoke to his competitors about ending the practice, but ultimately decided, in concert with his competitors, to continue the practice.  Robins said, "And I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place."[19]

33.     In that same article, Robins admitted that numerous employees have access to data that could give players an advantage, including customer service and engineering workers.

34.     Two years ago, Robins had called any sort of issue that affected "game integrity" fraud, and remarkably the first person to respond to his post was Haskell, the DraftKings employee who subsequently won $350,000 on FanDuel[20]:

---

[18] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (last visited Nov. 5, 2015)

[19] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasy-sports-but-didnt-expect-uproar/ (last visited Nov. 5, 2015)

[20] https://rotogrinders.com/threads/ok-industry-wide-concern-this-is-not-directed-at-any-single-85017?page=1 (last visited Nov. 5, 2015).

**JRobs**                                                                 2 years ago

This is a very interesting topic. One of the things DraftKings has been talking about from day 1 is fraud prevention, and while I cannot speak for other sites, I would imagine that many of the basic steps we have taken have been adopted by most. There is a whole category of payment fraud and identity fraud that we focus on, but I will focus here on the game integrity question since that is the one that was raised.

*DraftKings CEO*

First off, we built our customer support tools interface so that the same rules that apply to players on the site also apply to what our customer service representatives can do. In this case, that means that when games start and rosters lock, changes are no longer possible for either party. We have had people contact us claiming their screen "locked early" before they could make a swap and asking us to do it for them. Unfortunately, even if we wanted to, our customer support team literally can't do this.

However, it is possible that someone on our tech team could manually go into the database and change something by writing code. Aside from simply being VERY selective about who we give database access, we recognize that there is a need to protect against fraud here. Not only could a rogue employee be disruptive, but someone could attempt to hack the database, as well. I cannot go into detail about what exactly we do here, but we have put a lot of safeguards in place to prevent this. Additionally, we have very strong monitoring tools and reports that flag suspicious activity or things that simply should never be happening on the site, such as a lineup change made later than a contest start time. There are many other things we look for, as well, and we have actually caught a few players that were attempting fraud. A good sign to me is that every one of them has been caught immediately following their first fraud attempt and each one has been banned from the site by pretty much any identifiable characteristic – name, username, address, and even IP address.

Of course, fraud is an issue that (as Cal mentioned with poker) is naturally going to be a lightning rod for the DFS industry as it grows. I would love to see the sites start to band together on these things to help put current players at ease and make new players more comfortable giving DFS a try. I know within certain industries, fraud techniques are widely shared amongst competition, and I think it serves all of us well to minimize fraud on anyone's sites, not just our own. One no-brainer to me is some sort of public exchange between sites and affiliates of "known fraudster" lists. There is no reason why someone banned from one site should easily be able to go play on another. This is something we have talked about a lot internally, so I'd be interested to hear if other site reps out there think there might be broader interest within the industry in getting something like this going?

                                                          Reply Quote Link

**Ethan**                                                                 2 years ago



Awesome detailed response, Jason.

*DraftKings Rep*

                                                          Reply Quote Link

35.     In that post, Robins uses the word "fraud" or "fraudster" nine times.  Robins also discussed how sophisticated its data analysis and fraud prevention efforts were, including

tracking users by their Internet Protocol (IP) addresses. Thus, DraftKings could easily monitor users who worked for FanDuel or other sites to determine their winnings and whether there existed the possibility they were using inside information.

36.     Such actions are not confined to the two employees described above. According to Legal Sports Report, an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees – often executives – of other sites.' (From a DFS operator's point of view, a 'whale' is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)"[21]

37.     Indeed, FanDuel's CEO admitted to personally playing on competitor sites.[22]

38.     Had Plaintiff and/or members of the proposed classes known that Defendants were working in concert to allow employees of DFS sites to play against them, Plaintiff and members of the proposed classes would not have played on Defendants' websites.

39.     Had Plaintiff and/or members of the proposed classes known that Defendants had acted in concert to sanction this practice, Plaintiff and members of the proposed classes would not have played on Defendants' websites.

40.     After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, DraftKings and FanDuel issued numerous joint and/or identical statements on their websites, continuing to act in concert.

41.     DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed

---

[21] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (last visited Nov. 5, 2015)

[22] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3 (last visited Nov. 5, 2015)

to play on other sites and that other sites' employees were allowed to play on their site, and in fact were playing and winning on their websites at a high rate.

42.     Ultimately, Defendants together changed their internal rules to both prevent their employees from playing on other DFS sites and to prevent DFS employees from playing on their sites, an action that Defendants had previously decided, in concert, not to take.

## C. Invalidity of Arbitration Provision of Terms of Use

**FanDuel**

43.     FanDuel's "Terms of Use" do not a valid and enforceable contract.

44.     Plaintiff and the classes were fraudulently induced into placing money onto FanDuel because they were led to believe they would be competing in a fair game of skill without insiders or others using non-public information to compete against them.

45.     Plaintiff and Class members were presented with FanDuel's Terms of Use via a hyperlink during the registration process.  Customers are not given the option of rejecting or accepting the Terms of Use.  Plaintiff and Class members were given no opportunity to negotiate FanDuel's Terms of Use.  They were forced to either accept the Terms of Use in their entirety or else reject them and forego using FanDuel's website.  Plaintiff and Class members could not have procured equivalent services from competitors without being required to agree to similarly restrictive terms of use.

46.     The Terms of Use of FanDuel states that it:

[R]eserves the right, at its sole discretion, to modify or replace the Terms of Use at any time.  The most current version of these Terms will be posted on our Site. You shall be responsible for reviewing and becoming familiar with any such modification.  If a revision to the Terms, in our sole discretion, is material, we will notify you by contacting you through the email address associated with your account.  Use of the Services by you after any modification to the Terms constitutes your acceptance of the terms of Use as modified.

Plaintiff and the Class members are not empowered to accept or reject any changes to FanDuel's Terms of Use.

47.     FanDuel's Terms of Use also states that it "reserves the right to cancel contests, in our sole discretion, without any restrictions."  The Terms of Use further provide that "FanDuel may remove any User Content and terminate any FanDuel account at any time for any reason."

48.     This constitutes an illusory contract that is unenforceable.

49.     The terms of FanDuel's arbitration, waiver of class action rights and right to trial by jury are unconscionable and Plaintiff would not have agreed to those terms or deposited any money on FanDuel had he known about the fraudulent activity and misrepresentations as described in this complaint.

50.     FanDuel offers customers a 30-day window to opt out of the arbitration and class action waiver provisions.  A letter sent to FanDuel by Plaintiff's counsel on his behalf constitutes an opt-out of any such "Terms of Use" respecting arbitration or class action waiver, without prejudice to Plaintiff's position that no such waivers or provisions are enforceable, or that such provisions are unconscionable.  And by this Complaint, Plaintiff re-asserts and otherwise confirms without prejudice that he opts out of any and all arbitration and class action waiver provisions.

51.     Plaintiff's lineup data and other information constitutes personal intellectual property that Defendants, by and through its employees, has used to profit in violation of Plaintiff's rights.

52.     As a direct and proximate result of the actions described above, Plaintiff and members of the proposed classes have been damaged.

**DraftKings**

53.     Plaintiff has never deposited money with DraftKings and is not subject DraftKings' Terms of Use in any way.

54.     In addition, DraftKings's Terms of Use is not a valid, enforceable contract.

55.     Members of the Classes were fraudulently induced into placing money onto DraftKings because they were led to believe they would be competing in a fair game of skill without insiders or others using non-public information to compete against them.

56.     The so-called "Terms of Use" on DraftKings do not constitute a valid, mutual agreement because the promises made by DraftKings are illusory.  Indeed, there is no restriction on DraftKings' ability to terminate the "agreement" or to refuse to perform.  For example, the so-called "Terms of Use" provide that DraftKings and related individuals such as officers and directors are released from any liability for any claim by the user "whatsoever": By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to … [examples of various types of liability listed].

57.     Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to Defendant the right to deny service to any user for any reason "whatsoever": "DraftKings reserves the right, in its sole and absolute discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever." Thus, DraftKings is not bound to any performance obligation.

58.     Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give DraftKings the right, "without prior notice," to "revoke any or all of your rights granted hereunder." Thus, once again, DraftKings is not bound to any performance obligation.

59.     The Terms of Use purport to require arbitration, but gives DraftKings the right to revoke the arbitration provision because it states that "Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts."

60.     In addition, a user only has to check a box saying he or she has read the Terms of Use to sign up for the website, and the deposit of money and entry into contests is done through separate transactions.

61.     The DraftKings Terms of Use are procedurally and substantively unconscionable.

## CLASS ALLEGATIONS

62.     A class action is the proper form to bring Plaintiff's claims under FRCP 23. The potential classes are so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the classes, the claims or defenses of the representative parties are typical of the claims or defenses of the Classes, and the representative parties will fairly and adequately protect the interests of the Classes.

63.     This action satisfies all of the requirements of FRCP, including numerosity, commonality, typicality, adequacy, predominance and superiority.

64.     **Numerosity**: the Classes are so numerous that joinder of all members is impracticable.  While the exact number is not known at this time, it is generally ascertainable by

appropriate discovery.  News accounts discuss how millions of users compete on the websites of Defendants.

65.    **Commonality:** the claims made by Plaintiff meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the Classwide litigation. These shared questions predominate over individual questions, and they include, without limitation:

a)  Whether Defendants made the representations set forth above and substantially similar representations to Plaintiff and members of the proposed classes;

b)  Whether Defendants' advertisements were false, misleading or unfair;

c)  Whether Defendants owed duties to Plaintiff and the proposed classes, the scope of those duties and if they breached those duties;

d)  Whether Defendants fraudulently induced Plaintiff and the proposed classes into using their website under false pretenses, through material misrepresentations or material omissions;

e)  Whether consumers were harmed by Defendants' actions as described above;

f)  Whether the Terms of Use on each Defendants' website are unconscionable, illusory, fraudulent or otherwise invalid;

g)  The extent of the damages caused by Defendants' acts.

h)  Whether Defendants' employees used non-public data and/or information to gain an advantage at DFS sites, whether Defendants acted in concert to condone, allow or promote this practice, or whether Defendants were negligent in allowing employees to access and use confidential data, or were negligent or committed

fraud in failing to disclose to Plaintiff and the proposed classes that these practices were occurring

66.    **Typicality**: Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other Class member, was induced to use Defendants' sites based on false and misleading advertisements of fair play, and lack of information about having to compete against players with inside information.

67.    The claims of the Class Representative Plaintiff are furthermore typical of other Class members because they make the same claims as other class members. Plaintiff has an interest in seeking compensation from Defendants.

68.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Classes in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Classes. Plaintiff seeks no relief that is antagonistic or adverse to the members of the classes and the infringement of the rights and the damages he has suffered are typical of other class members.

69.    **Superiority:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those

class members who could afford to litigate such a claim, it would still be economically impractical.

70.     The nature of this action and the nature of state and federal laws available to Plaintiff and the Classes makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged; and Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

71.     The proposed Classes and/or subclasses are described as follows:

**"All persons in the United States who deposited money into a FanDuel account before Oct. 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site."**

**All persons in the United States who deposited money into a DraftKings account before Oct. 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site."**

**"All persons in California who deposited money into a FanDuel and/or DraftKings account before Oct. 6, 2015, and competed in any contest where other entries were made by employees from DraftKings, FanDuel or any other DFS site." (the California Subclass)**

72.     Plaintiff reserves the right to modify or amend the definition of the proposed classes and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

73.     Plaintiff will fairly and adequately protect the interests of the class. The interests of the class representative are consistent with those of the other members of the Classes. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

74.     The class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

75.     Excluded from the Class are:

    a.     Defendants and any entities in which Defendants have a controlling interest;

    b.     Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants;

    c.     The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

    d.     All persons or entities that properly execute and timely file a request for exclusion from the Class;

    e.     Any attorneys representing the Plaintiff or the Class.

## CLAIMS FOR RELIEF

### COUNT I

### FRAUD
**(Brought on behalf of the Nationwide Class and the California Class)**

76.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

77.     Plaintiff brings this claim on behalf of himself and the proposed Classes.

78.     As is fully alleged above, throughout the class period, Defendants made misrepresentations and material omissions of fact which were false and which Defendants knew to be false.  Specifically, Defendants misrepresented that their fantasy sports contests were fair games of skill.  Defendants willfully failed to disclose that their employees and agents, owners and/or others with access to nonpublic statistics and other information could use this information, which gives them a significant competitive advantage, to participate in  fantasy sports games on competitors' websites and compete against Plaintiff and the Class members.

79.     Defendants had superior knowledge regarding their employees' access to statistical information and their employees' ability to use that information to gain a competitive advantage in competitors' fantasy sports games.  The knowledge that Defendants' employees were using nonpublic information to gain a competitive advantage in fantasy sports games was not readily available to Plaintiff and the Class members.  Failing to disclose this information to Plaintiff and the Class members rendered Defendants' transactions with Plaintiff and the Class members inherently unfair.  Defendants therefore had a duty to disclose this information to Plaintiff and the Class members.

80.     Defendants' misrepresentations and omissions created the illusion that their games were fair games of skill.  Defendants' misrepresentations and omissions were made for the purpose of inducing Plaintiff and members of the Classes to join their websites and pay entry fees to Defendants to participate in their fantasy sports games.

81.     Plaintiff and the Class members justifiably relied on Defendants' misrepresentations and omissions when they joined Defendants' websites, paid Defendants' entry fees, and participated in Defendants' fantasy sports  games.  Defendants knew, or should have known, that the integrity of the fantasy sports games was a material fact inducing Plaintiff and

the Class members to pay entry fees and participate.  Plaintiff and the Class members would not have paid entry fees and participated in Defendants' fantasy sports games absent Defendants' misrepresentations and omissions regarding the same.

82.    As a result of Defendants' fraudulent misrepresentations and omissions, Plaintiff and the Class members were induced into transactions that they otherwise would not have made and suffered financial injury, harm, and damages as described in this Complaint.

## COUNT II

### NEGLIGENT MISREPRESENTATION
**(Brought on Behalf of the Nationwide Class and the California Class)**

83.    Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

84.    Plaintiff brings this claim on behalf of himself and the proposed Classes.

85.    Defendants had a duty to disclose to Plaintiff and the Class members that their employees had access to internal information not available to the general public and that the statements that "winners are determined by the individuals who use their skill and knowledge of relevant professional sports information and fantasy sports rules to accumulate the most fantasy points" was misleading.  Likewise, Defendants had a duty to disclose the true nature of the bonus awarded to new subscribers.

86.    Defendants negligently and/or carelessly misrepresented, omitted, and concealed from consumers material facts relating to online fantasy sports offered by Defendants.

87.    These misrepresentations and omissions were material and concerned the specific information that a reasonable consumer would consider in choosing to participate in the online fantasy sports offered by Defendants.

88.      As a result of Defendants' misstatements and omissions, they were under a duty to disclose the additional facts necessary to avoid any misrepresentation or confusion.  Further, Defendants knew of their misrepresentations and omissions.

89.      At the time, Defendants failed to disclose, conceal, suppress, and/or omitted material information they knew, or by the exercise of reasonable care should have known, that the statements were false and misleading to reasonable consumers.

90.      Plaintiff and Class members were unaware of the falsity of Defendants' misrepresentations and omissions and, as a result, justifiably relied on them in participating in the online fantasy sports offered by Defendants.

91.      Had Plaintiff and Class members been aware of the truth, they would not have participated in Defendants' DFS programs.

92.      As a direct and proximate result of Defendants' misrepresentations and omissions of material fact, Plaintiff and Class members have suffered and will continue to suffer damages and losses as alleged herein in an amount to be determined at trial.

## COUNT III

### NEGLIGENCE
### (Brought on Behalf of the Nationwide Class and the California Class)

93.      Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

94.      Defendants promise in their "Terms of Use" that their fantasy sports games are "games of skill" and accepted entry fees from Plaintiff and Class members to participate in those games.  According to those same "Terms of Use," "winners are determined by the  individuals

who use their skill and knowledge of relevant professional sports information and fantasy sports rules to accumulate the most fantasy points."

95.     Defendants owed a duty to Plaintiff and the Class members to use reasonable care to provide true, reliable, and accurate information regarding the administration of their fantasy sports games.  Defendants also owe a duty to protect the fairness and integrity of the fantasy sports games being operated on their websites.

96.     Defendants breached these duties to Plaintiff and the Class members by failing to prevent persons possessing nonpublic information, by virtue of their employment by other fantasy sports websites, from competing against Plaintiff and the Class members.  Defendants further breached these duties by allowing their employees to participate in fantasy sports games on competitors' websites.

97.     Defendants failed to use reasonable care in communicating the information about safety and security of data, employee access to data, and ability of employees to use material nonpublic data to compete against Plaintiff and the Class members on other websites, or allow employees of other companies with material nonpublic access to compete on the websites where Plaintiff and the Class members competed.

98.     As a direct and proximate result of Defendants' negligence, Defendants' significantly and materially decreased Plaintiff and the Class members' ability to use their skills to win the fantasy sports games they entered, and Plaintiff and the Class members suffered financial injury, harm, and damages.

## COUNT IV

### UNJUST ENRICHMENT
**(Brought on Behalf of the Nationwide Class and the California Class)**

99.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

100.     Defendants have benefited and been enriched from their unlawful acts by accepting the benefit conferred by Plaintiff and the Class members.

101.     Defendants also benefited from securing and retaining their employees by providing them insider information that was valuable to these employees and exploited by them for personal gain to the detriment of Plaintiff and the Classes.

102.     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the entry fees paid by Plaintiff and the Class members to participate in Defendants' fantasy sports games.

103.     Defendants' ill-gotten gains were at the expense of Plaintiff and the Class members through their payment of entry fees to participate in Defendants' fantasy sports games.

104.     It is against equity and good conscience to permit Defendants to retain their ill-gotten profits.

### COUNT V

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
**(California Business and Professions Code §§17200, *Et Seq.*)**
**(Brought on Behalf of the California Class)**

105.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

106.     Plaintiff brings this claim on behalf of himself and the proposed California Class.

24

107.    California Business and Professions Code §§17200, *et seq.*, prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

108.    California Business and Professions Code §§17200, *et seq.*, imposes strict liability.  Plaintiff does not have to prove Defendants intentionally or negligently engaged in "unlawful, unfair, or fraudulent business acts or practice."

109.    Defendants engaged in unlawful business acts and practices in violation of California Business and Professions Code §§ 17200, *et seq.*, by engaging in unfair, unlawful, and fraudulent business acts or practices as described herein, including failing to disclose the access their employees had to nonpublic information and would utilize in the online fantasy sports program.

110.    Defendants' practices are likely to deceive, and have deceived, members of the public.

111.    Defendants knew, or should have known, that their misrepresentations, omissions, failure to disclosure and/or partial disclosures omit material facts and are likely to deceive a reasonable consumer.

112.    Defendants continued to make such misrepresentations despite the fact they knew, or should have known, that their conduct was misleading and deceptive.

113.    By engaging in the above-described acts and practices, Defendants committed one or more acts of unfair competition within the meaning of Unfair Competition Law, California Business and Professions Code §§ 17200, *et seq*.

114.    Plaintiff reserves the right to identify additional provisions of law violated by Defendants as further investigation and discovery warrants.

115.    Defendants' misrepresentations, business practices, and their false and misleading advertising constitute "unfair" business acts and practices because such conduct is immoral, unscrupulous, and offends public policy.

116.    Defendants' misrepresentations, business practices, and their false and misleading advertising constitute "fraudulent" business acts and practices because members of the consuming public, including Plaintiff and the Class members, were and are likely to be deceived thereby.

117.    The harm to Plaintiff and members of the Class outweighs the utility, if any, of Defendants' acts and practices described above and, therefore, Defendants' acts and practices constitute unfair business acts or practices.

118.    Defendants' acts and practices have detrimentally impacted competition and caused substantial harm to Plaintiff, the Class members, and the consuming public.  Plaintiff and the Class members were misled and suffered injuries and lost money or property as a direct and proximate result of Defendants' unlawful business acts and practices.

119.    Defendants knew, or reasonably should have known, their misleading business practices allowing employees to utilize inside information were likely to deceive reasonable consumers.

120.    Defendants' misrepresentations and their false and misleading business practices present a continuing threat to consumers in that such advertising will continue to mislead consumers.

121.    By reason of the foregoing, Defendants should be required to pay damages and/or make restitution to Plaintiff and the Class members and pay for Plaintiff and the Class members' attorneys' fees.

## COUNT VI

### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW
**(California Business and Professions Code §§ 17500, *Et Seq.*)**
**(Brought on Behalf of the California Class)**

122.    Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

123.    Plaintiff brings this claim on behalf of himself and the proposed California Class.

124.    Defendants are disseminating advertising in California and throughout the United States.

125.    California Business and Professions Code §§ 17500, *et seq.*,  provides that:

[I]t is unlawful for any ... corporation ... with intent ... to dispose of personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or  other publication, or  any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading....

126.    When Defendants disseminated the advertising, they knew, or by the exercise of reasonable care should have known, that the statements were untrue or misleading, or omitted to state the truth about their services and related terms, in violation of the False Advertising Law, California Business and Professions Code §§ 17500, *et seq.*  Specifically, Defendants failed to disclose that their employees had access to internal information that created an unfair  advantage to the average consumer.

127.    Plaintiff and the Class members were misled and suffered injuries and lost money or property as a direct and proximate result of Defendants' misrepresentations and their false and misleading statements in violation of California Business and Professions Code §§ 17500,*et. seq.*

128.    As a result of Defendants' wrongful conduct, Plaintiff and the Class are entitled to restitution and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

129.    Pursuant to California Business and Professions Code §§ 17203 and 17535, Plaintiff and the members of the Class seek an order of this Court enjoining Defendants from continuing to engage, use, or employ the above-described  practices in advertising and marketing their services.

130.    Likewise, Plaintiff seeks an order requiring Defendants to make full corrective disclosures to correct their prior misrepresentations, omissions, failures to disclose, and partial disclosures.

131.    On information and belief, Defendants have failed and refused, and in the future will fail and refuse, to cease their deceptive advertising practices, and will continue to do those acts unless this Court orders Defendants to cease and desist pursuant to California Business and Professions Code § 17535.  The corrective statement by Defendants did not fully address all misrepresentations.

132.    Plaintiff, individually and on behalf of the Class, seeks restitution, disgorgement, injunctive relief, and all other relief allowable under California Business and Professions Code §§ 17500, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed classes pray for relief and judgment against Defendants, as follows:

        a.    For an order certifying the proposed classes, appointing Plaintiff and his counsel to represent the proposed class and notice to the proposed classes to be paid by Defendants;

b. For damages suffered by Plaintiff and the proposed classes;

c. For restitution to Plaintiff and the proposed classes of all monies wrongfully obtained by Defendants;

d. For injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e. An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

f. For Plaintiff's reasonable attorneys' fees, as permitted by law;

g. For Plaintiff's costs incurred;

h. For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i. For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

## **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all counts so triable.


DATE:  November 5, 2015    Respectfully submitted,

          BARRACK, RODOS & BACINE



          s/ Michael A. Toomey
          MICHAEL A. TOOMEY (MT6688)

11 Times Square, 640 8th Ave. 10th Floor
New York, New York 10036
Telephone:  (212) 688-0782
Facsimile:  (212) 688-0783
mtoomey@barrack.com

BARRACK, RODOS & BACINE
STEPHEN R. BASSER
600 West Broadway, Suite 900
San Diego, CA  92101
Telephone:  619/230-0800
619/230-1874 (fax)
sbasser@barrack.com

*Attorneys for Plaintiff*